UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KIMBERLY COPELAND,

    Plaintiff,

v.

    Case Number: 11-10633

    Honorable Thomas L. Ludington

MID-MICHIGAN REGIONAL MEDICAL
CENTER d/b/a MID-MICHIGAN HEALTH,

    Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S MOTION FOR LEAVE TO FILE EXCESS PAGES, DENYING AS MOOT DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY, DISMISSING PLAINTIFF'S FEDERAL CLAIMS WITH PREJUDICE AND DECLINING JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS**

    MidMichigan ("Defendant") is a hospital in Midland, Michigan. Defendant hired Plaintiff on July 9, 1989 as a "job trainee" and became a registered Cardiovascular Technician in Defendant's Cardiovascular Services Department in 1994. In this position she performed EKG's, arterial Doppler monitoring, stress tests, and holter monitoring. Plaintiff developed a romantic relationship with another woman, Annie Schuell, who was also employed by the Defendant as the Supervisor of Cardiovascular Services. Schuell was Plaintiff's supervisor for a period of time. Defendant was aware that Plaintiff and Schuell lived together and were involved in a close relationship, and, accordingly, Plaintiff's performance evaluations were completed by the Manager of Cardiovascular Services, Dennis Bauer. In May 2000, Defendant demoted Schuell because her "significant other" relationship with Plaintiff violated the "Employment of Family Members" policy. Plaintiff and Schuell were same-sex partners from February 1990 until September 2009.

    During the time period relevant to this case, Stephanie Petras was supervisor of the

Cardiovascular Services Department, Tim Westcott was the Manager of Invasive Imaging & Cardiovascular Services, and Jan Penney was the Vice President of Cardiovascular Services. Dr. Charles Sanislaw was the Medical Director for the department.

There were four other technicians in the Cardiovascular Services Department. Plaintiff performed vascular stenography and cardiac studies (EKGs, stress tests, holters, etc.) and, every three years, coordinated information for the department's Intersocietal Commission for the Accreditation of Vascular Laboratories ("ICAVL") accreditation. Each day, technicians in the department were assigned to perform both outpatient studies in the department and inpatient studies either in the department or in patient rooms. Technicians were required to document and videotape each study so that physicians could interpret them. Technicians also entered study information into the department's DATACHECK system so that the department could perform quality control, correlate study information, and collect data and information for ICAVL accreditation.

During her employment, Plaintiff received several different versions of MidMichigan's Employee Handbook. Of relevance to this case, Plaintiff received a copy of the 2009 Employee Handbook, which provided that the Employee Handbook was not a contract and that "policies and benefits described are not conditions or contracts of employment." Copeland Dep. Ex.1 at 3, 15.

In July 2006, Petras began supervising the Cardiovascular Services Department. Petras was a demanding supervisor; the most demanding supervisor that Plaintiff had, according to Plaintiff. Plaintiff testified that Petras disciplined a number of technicians and that she seemed "write up happy." Copeland Dep. 86. David Hill, another technician in the department described Petras as "strict in that anybody and everybody got held accountable for what was written for our job performance as far as whatever is expected of each of us." Hill Dep. 14. Hill stated that Petras

applied the same standards to all technicians and that other technicians were disciplined, and discharged, for offenses similar to Plaintiff's. Hill Dep. 14-15. Petras testified that a married, male technician was discharged around the same time as Plaintiff for similar offenses. Petras Dep. 61-62, 66-68.

In Plaintiff's performance review for June 1, 2006 through May 31, 2007, Plaintiff scored a 342 out of 400, with a score of 300 being a "meeting expectations" score. The review also reflected, however, that Plaintiff lacked teamwork skills and that her peers reported that she caused friction among co-workers. Plaintiff agreed that her coworkers "felt [her] to be a little bossy" but believes that her co-workers gave negative feedback about her because she would ask for special adjustments to her schedule to accommodate her attendance in nursing school. Copeland Dep. 64-66.

In October 2007, Schuell was working as a sonographer in the Cardiovascular Services department when she was diagnosed with brain cancer. Copeland Dep. 20, 36. Schuell was scheduled for emergency surgery on October 22, 2007. This required Plaintiff to miss work because she was Schuell's primary caregiver. Schuell then commenced treatment on November 2007 in Texas at the MD Anderson Cancer Treatment Center. Schuell had a number of setbacks in the following months, including a MERSA infection and a stroke. Because the Family and Medical Leave Act ("FMLA") regulations define "spouse" as "a husband or wife defined or recognized under State law for the purposes of marriage . . . .," 29 C.F.R. § 825.112(a), the FMLA did not provide for Plaintiff to take FMLA leave to care for Schuell. Plaintiff was offered personal leave to care for Schuell, but did not do so because "it was financially something [she] couldn't do." Copeland Dep. 100. Plaintiff believed it unfair that the FMLA did not apply to her care for Schuell.

Plaintiff's tenuous relationship with her co-workers did not resolve in 2008. Her 2008

performance review for March 31, 2007 through June 1, 2008, despite reflecting a score of 314, notes that Plaintiff "is regarded by co-workers as someone who is not a team player and lacks initiative." Copeland Dep. Ex. 7. Plaintiff's co-workers described her as "confrontational and complaining." *Id.* Again, Plaintiff believed that her co-workers were not happy with her because she was going to school. Copeland Dep. 73. Plaintiff's 2008 performance review also identified concerns that Plaintiff "will turn in incomplete tech sheets, mislabeled requisitions, and will deviate from the protocol at times." Copeland Dep. Ex. 7. Plaintiff remembered that those concerns were the results of complaints from Dr. Sanislaw. Copeland Dep. 69-70. In addition, the review stated that Plaintiff "does not show an ability to multi-task, and will take more time to complete paperwork than the average tech." Copeland Dep. Ex. 7. Plaintiff admitted that she did have difficulty multi-tasking and completing tasks but attributed it being distracted by Schuell's medical issues. Copeland Dep. 69-70. Plaintiff testified that she told Petras that it was becoming "more difficult to handle the situation," but she did not ask for any assistance. Copeland Dep. 73-74, 80, 157-158. Further, Plaintiff agreed that she was able to perform all of her job functions. Copeland Dep. 77.

Because Plaintiff told Defendant that she was having a hard time dealing with Schuell's illness, she was encouraged to apply for FMLA leave for herself. Plaintiff got the FMLA paperwork and completed a request for FMLA leave, asking for intermittent FMLA leave for her own depression. When Plaintiff received the request form, she also received a Certification of Healthcare Provider Form and was advised that she must have her healthcare provider complete the form and return it to Defendant within fifteen days. Copeland Dep. Ex. 21. Plaintiff did not return the completed form.

On February 10, 2009, Plaintiff received a Formal Counseling Action for two separate policy

-4-

violations. Although Petras could have issued two separate Formal Counseling Actions for the violations, she combined them into a single discipline step. The first violation was for downloading software, iTunes, onto the department computer without authorization and in violation of Defendant's Proper Computer Use policy. Petras was notified of the violation by a representative of Defendant's IR department in early February 2009 but Plaintiff downloaded the program almost a year prior to the discovery. Copeland Dep. Exs. 13, 14. The second violation was for calling in to inform Defendant she would be unable to work thirty minutes, rather than at least one hour as required by department policy, prior to her shift. Copeland Dep. Exs. 13, 15. Plaintiff admits that she called into work less than an hour before the start of her shift but attributed the delay to an intestinal illness. Copeland Dep. 109. Plaintiff testified that she did not know about the call-in rule yet acknowledged that she had seen the department policy which contained the rule prior to the incident. Plaintiff characterized the severity of her illness as making it impossible for her to notify her supervisor, and thought that no discipline should have occurred because the Corrective Action policy states that discipline is inappropriate in unusual circumstances that make it impossible to notify a supervisor of an absence from a scheduled work shift. Copeland Dep. 110-12.

In April 2009, Plaintiff received a second Formal Counseling Action for parking in a non-designated space. Copeland Dep. Ex. 16. When Defendant's security employees issue a parking ticket to an employee, disciplinary action is mandated. Petras Dep. 54-55; Westcott Dep. 34-35. Plaintiff received a parking ticket while at work, and, pursuant to Defendant's procedures, also received Formal Counseling Action. At the time she received the ticket, Plaintiff believed it was unfair because the space was not clearly marked. Copeland Dep. 117-118. Defendant had received similar complaints from other employees who had also received a ticket for parking the same place.

Copeland Dep. 117-118; Westcott Dep. 19-20; 34-35. Although the parking director initially rescinded the violation, after a review, Defendant decided that all tickets for parking in the spot —including Plaintiff's—would remain.

When Petras issued the discipline regarding the parking violation after returning from a medical leave of absence, Plaintiff commented that the department had been much nicer with Petras gone. According to Plaintiff, that comment caused Petras to "go after" her. On May 13, 2009, Plaintiff was presented with an "action plan." ECF No. 19 Ex. 19. The action plan extended Plaintiff's probation to August 30, 2009. Plaintiff thought the action plan raised new issues regarding Plaintiff's time spent on the ICAVL, process to which she was not assigned and received no additional compensation. Plaintiff also thought the action plan was inconsistent with her performance evaluations that had been issued because the action plan stated that it was a result of multiple examples of job performance below established standards.

Plaintiff's 2009 performance review reflected a score of 300 for June 1, 2008 through June 1, 2009 but continued to identify serious concerns. Her co-workers were complaining that she was slow in completing exams, which caused frustration and back-up with patients. Copeland Dep. Ex. 8. Plaintiff testified that her lack of timeliness was due to the fact that the department switched to a new computer system in early 2009. According to Plaintiff, that change required all technicians to videotape studies and to enter them into the computer. Plaintiff explained her difficulty in completing the exams more quickly to Petras, who responded that the other technicians were managing the change and that Plaintiff would need to do the same. In addition, the 2009 review states that Plaintiff made errors that required some patients to be called back to the hospital for additional testing. Copeland Dep. Ex. 8. In one example, Plaintiff forgot to measure a patient's aorta,

and the patient was required to return to Defendant to complete the test. Copeland Dep. Ex. 9; Copeland Dep. 93-94. The review also indicates concerns regarding Plaintiff's failure to meet deadlines for the ICVAL accreditation process. Copeland Dep. Ex. 9. Finally, the review continued to identify issues between Plaintiff and her co-workers.

On May 13, 2009, Plaintiff received a third Formal Counseling Action for failing to meet deadlines for the ICAVL accreditation process and taking a long time to complete studies. Copeland Dep. Ex. 17; Copeland Dep. 122-123, 125. With regard to the timely completion of studies, Petras was following time allotments that had been established by the department and were applied to all technicians. Other technicians received disciplinary action for not meeting the same requirements. Plaintiff testified that she believed that Petras issued the discipline because Petras was going "after her" due to her earlier comment about the department being "nicer" with Petras on medical leave. Copeland Dep. 125-126. With the Formal Counseling Action, Plaintiff also was given an Action Plan. Copeland Dep. Ex. 17. Among other directives, Plaintiff was instructed to "notify the Lead Tech or her supervisor or manager if she is leaving the department for any reason." Copeland Dep. Ex. 17. That limitation was placed on Plaintiff because she "was missing in action many times and [Defendant] felt it was important to put that rule in place for her." Wescott Dep. 26.

On July 23, 2009, at 7:49 a.m., Plaintiff submitted a request to the radiology department to have a patient sent down for testing at 8:15 a.m. Plaintiff then left the department to visit Schuell without notifying the Lead Tech, her supervisor, or her manager. Sometime thereafter, the runner who brought Plaintiff's patient to the department advised Petras that she was upset because she needed to leave and there was nobody to attend to the patient. Petras went down to the department and was unable to locate Plaintiff. So that the patient would not be left alone, Petras waited for

Plaintiff to return. Plaintiff testified that she did not return to the department until 8:25 a.m. because she was having an important conversation with Schuell's healthcare providers. Copeland Dep. 146. The action plan stated that Plaintiff was to notify the Lead Tech or her supervisor or manager if she were to leave the department for any reason, but Plaintiff testified that she did not understand this to apply to her break periods. Copeland Dep. 151. Plaintiff thought her untimely return should have been considered a tardy, and one "incident" of tardiness occurs after six tardies under Defendant's Corrective Action and Disciplinary Procedure & Rules of Conduct. Her violation nonetheless resulted in a fourth Formal Counseling Action, which warranted her discharge under the Corrective Action Policy. Copeland Dep. Ex. 19. Plaintiff was then suspended pending investigation of the violation.

After a meeting that included Petras, Penney, Westcott, Karen Calkins, Vice President and Chief Nursing Officer, and Lynn Bruchhof, Vice President of People Resources, Defendant decided to terminate Plaintiff's employment pursuant to the Corrective Action Policy. All of the decision-makers were aware that Schuell had terminal brain cancer and of Plaintiff's relationship with Schuell. After Plaintiff's discharge, she was replaced with another female employee. Plaintiff is not aware of any other MidMichigan employee with a similar discharge history who has not been discharged. Copeland Dep. 152-153.

Plaintiff filed a complaint on February 16, 2011, pleading claims for violations of the Americans with Disabilities Act ("ADA") for discriminating against Plaintiff because of her association with a disabled person, violations of Title VII of the Civil Rights Act of 1964 and Michigan's Elliot-Larsen Civil Rights Act alleging that Plaintiff was discriminated against because of her gender, sexual orientation, and marital status, violation of the FMLA for failing to provide

Plaintiff with FMLA leave, demoting her, putting her on probation, and ultimately terminating her employment as a result of her absences to care for her significant other, and a cause of action for breach of policy under Michigan law.

Defendant filed a motion to exclude the testimony of Plaintiff's expert and a motion for summary judgment on November 14, 2011. ECF Nos. 12 ,14. Defendant's brief in support of their motion for summary judgment is twenty-two pages, and accompanied by a motion for leave to file a brief exceeding twenty pages. Defendant's motion will be granted, and the brief in support of its motion for summary judgment will be accepted as filed. For the reasons provided herein, the Court will grant Defendant's motion for summary judgment, decline jurisdiction over Plaintiff's state law claims, and deny Defendant's motion to exclude expert testimony as moot.

## I. Standard of Review

A motion for summary judgment should be granted if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be proven or is genuinely disputed must support the assertion by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. Pro. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the opposing party fails to raise

genuine issues of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Anderson*, 477 U.S. at 250.

The court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## II. Discussion

### A. Timeliness of Plaintiff's Claims

Defendant first challenges Plaintiff's ADA and Title VII claims as untimely because she filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") more than 300 days after her discharge. 42 U.S.C. § 2000e-5(e)(l); *Nichols v. Muskingum College*, 318 F.3d 674, 679-80 (6th Cir. 2003); *see also* 42 U.S.C. § 12117(a); *Amini v. Oberlin College*, 259 F.3d 493, 498 (6th Cir. 2001). Defendant notes that Plaintiff's employment was terminated on July 28, 2009 and she was thus required to file a charge of discrimination with the EEOC on or before May 25, 2010 but did not do so until June 7, 2010.

A "charge" is defined as a "request for the [EEOC] to take remedial action to protect employee's rights or otherwise settle dispute between employer and employee." *Federal Express*

*Corporation v. Holowecki*, 552 U.S. 389, 396, 399, 405 (2008). Plaintiff submitted her EEOC intake questionnaire on April 20, 2010 and the submission of the EEOC intake questionnaire satisfies the definition of "charge." *Id.* Plaintiff's claims are timely.

### B. Plaintiff's Claims of Sexual Orientation and Marital Status Discrimination

Plaintiff asserts that she is a member of a protected class by virtue of her gender, marital status, and sexual orientation pursuant to Title VII. Neither marital status nor sexual orientation are protected statuses pursuant to Title VII, which makes it unlawful for an employer to, in relevant part, discharge or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of the individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2. Plaintiff does not provide any clarification regarding her gender discrimination claim, but appears to be alleging a Title VII gender stereotyping claim. An employee may maintain an action under Title VIl for gender stereotyping where employment decisions or workplace harassment are based on the perception that the employee is not masculine enough or feminine enough and he or she fails "to conform to [gender] stereotypes." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989); *Vickers v. Fairfield Medical Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006). Plaintiff does not, however, provide any factual support for a gender discrimination claim, and her claims for discrimination based on her marital status and sexual orientation fail as a matter of law.

### C. Plaintiff's Claim for Violation of the ADA for Association and Familial Relationship with a Disabled Person

Plaintiff asserts that she "is a member of a protected class by virtue of association and familial relationship with a disabled person, her significant other" and that she "was treated differently, disciplined aud ultimately terminated and denied benefits by Defendant because [of] the

known disability of Plaintiff's significant other." ECF No. 1 par. 34. The ADA prohibits "excluding or denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4).

Claims brought under subsection (b)(4) are referred to as "associational discrimination." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011). The Sixth Circuit has relied on the three theories in *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004) into which "association discrimination" plaintiffs generally fall: (1) "expense"; (2) "disability by association"; and (3) "distraction." *Stansberry*, 651 F.3d at 487. The "expense" theory covers situations where an employee suffers an adverse employment action because of his or her association with a disabled individual covered under the employer's health plan, which is costly to the employer. *Id.* The "disability by association" theory encompasses two related situations. *Id.* Either the employer fears that the employee may contract the disability of the person he or she is associated with (for example the employee's partner is infected with a communicable disease and the employer fears the employee may become infected), or the employee is genetically predisposed to develop a disability that his or her relatives have. *Id.* The "distraction" theory is based on the employee's being somewhat inattentive at work because of the disability of someone with whom he or she is associated. *Id.* In this case, Plaintiff relies on a "distraction" theory.[1]

---

[1] Plaintiff contends that the "distraction" theory provides protection from being discriminated against for "being somewhat inattentive at work because of the disability of someone with whom he or she is associated." ECF No. 19 at 11. This, however, is not the standard in the Sixth Circuit following *Stansberry*, where the court made clear that a plaintiff must establish that his or her employment was terminated based on an unfounded fear that the associated person's disability might cause the non-disabled employee to be inattentive at work.

The Sixth Circuit has applied the *McDonnell Douglas* burdening shifting test to associational discrimination claims. *Stansberry*, 651 F.3d at 487 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). At the prima facie stage, the plaintiff must establish (1) the employee was qualified for the position; (2) the employee was subject to an adverse employment action; (3) the employee was known to be associated with a disabled individual; and (4) the adverse employment action occurred under circumstances that raise a reasonable inference that the disability of the relative was a determining factor in the decision. *Id.* After establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking adverse action against the plaintiff. *Id.* Finally, the burden shifts back to the plaintiff to establish that the nondiscriminatory reason articulated by the defendant is actually pretext for unlawful discrimination. *Id.*

Under this framework, Plaintiff satisfies the second and third elements of a prima facie case because her termination is an adverse action and Defendant was aware of Schuell's illness. Plaintiff argues that the timing of her termination alone is sufficient to satisfy the fourth prong of the prima facie case. *Deboer v. Musashi Auto Parts*, 124 F. App'x 387, 391 (6th Cir. 2005). More specifically, the timing of Schuell's diagnosis corresponds with the commencement of the series of disciplinary actions that Plaintiff characterizes as minor infractions in order to justify Plaintiff's termination.[2]

---

[2] Plaintiff contends that a May 2008 Formal Counseling Action for absenteeism inappropriately included a reference to October 22, 2007, among other dates, although she had been previously approved for taking that day off to participate in Schuell's medical care and treatment. Defendant submits that Formal Counseling Actions remain active only for 12 months and the May 2008 Formal Counseling Action occurred more than 12 months prior to Plaintiff's discharge. Moreover, Plaintiff received four other Formal Counseling Actions within 12 months of her discharge and there is no evidence that Defendant considered the May 2008 Formal Counseling Action in making its decision.

Plaintiff contends that this demonstrates that Defendant deliberately created a "paper trail" documenting her poor performance only after deciding to terminate her because of her association with Schuell.

To maintain an ADA claim under the "distraction" theory, Plaintiff must show that her job performance was *not* actually impacted by Schuell's health issues and that Defendant terminated her employment based on unfounded fears that her job performance may suffer in the future. It is irrelevant if any job performance issue were actually caused by Schuell's disability, but Plaintiff does not, however, argue that her performance at work suffered because of the unfounded belief about her need to care for Schuell in the future. Plaintiff's argument is that Defendant spent over a year and a half creating a paper trail in order to justify their earlier decision to terminate Plaintiff's employment.

Plaintiff, however, does not explain why any inference should be drawn that the action was taken because Defendant was concerned that her performance would suffer in the future in order to satisfy the fourth prong. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 511 (3d Cir. 2009) (finding no evidence of discrimination in part because the employer was aware of the plaintiff's child's disability for many years before firing the plaintiff). Section 12112(b)(4) is meant to protect individuals from being discriminated against based on an unfounded fear that the individual's job performance will suffer in order to care for the associated disabled person, but does not require employers to provide any reasonable accommodations to the non-disabled employee. 651 F.3d at 486-87. Plaintiff does not contend that her employment was terminated because of such an unfounded fear; on the contrary, she argues that she was treated unfairly because she was in a homosexual relationship with Schuell who was disabled because of her illness. Accordingly,

Defendant's motion for summary judgment on this claim will be granted.

### D. Plaintiff's FMLA Interference Claim

Plaintiff's response contends that she has asserted a claim for interference with her FMLA rights because, in August 2008, Defendant failed to respond to her request for FMLA leave for her own serious health condition. The claim is not identifiable in the complaint. However, even if the claim had been included in the complaint, it is untimely because the limitations period for FMLA claims is two years, 29 U.S.C. § 2617(a)(4), and Plaintiff's complaint was not filed until February 2011.

Plaintiff does, however, assert a claim for violation of the FMLA for failing to provide leave, demoting her, and putting her on probation as a result of her absences to care for her significant other, which resulted in her employment being terminated. In order to prevail on her claim, Plaintiff must demonstrate that Defendant denied her FMLA benefits to which she was entitled. *Cavin v. Honda of America Mfg. Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). The FMLA allows employees to take leave in order to care for a "spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(l)(C). The regulations implementing the FMLA define the term "spouse" as follows:

> (a) Spouse. Spouse means a husband or wife defined or recognized under State law for the purposes of marriage in the State were the employee resides, including common law marriage in States where it is recognized.

29 C.F.R. § 825.122(a).

In Michigan, same-sex marriages are not constitutionally recognized and common law marriages were abolished in 1957. Mich. Const., Art. I , Section 25; Mich. Comp. Laws § 551.2. Because Schuell was not Plaintiff's wife as defined or recognized under state law, Defendant argues

that Plaintiff was not entitled to FMLA leave to care for Schuell and her claim should be dismissed. Plaintiff's response emphasizes that Defendant has violated its internal FMLA policy because the employee handbook defines "family member" to include persons such as Schuell. A review of Defendant's FMLA policy reflects that a qualifying family member is, in relevant part, a "spouse, child or parent with a serious health condition." ECF No. 19 Ex. 14 at 1-2. Any possible cause of action relating to violation of internal policy by virtue of Defendant's handbook definition of "family member" does not provide a basis for a claim under the FMLA. Defendant's motion for summary judgment on Plaintiff's FMLA claim will be granted.

### E.    Plaintiff's State Law Claims

Defendant's motion also seeks dismissal of Plaintiff's ECLRA claim and breach of policy claim under Michigan law. Because Defendants are entitled to summary judgment on all of Plaintiff's federal claims, the Court will decline to exercise jurisdiction over Plaintiff's state law claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Washington v. Starke*, 855 F.2d 346, 351 (6th Cir. 1988) ("It is a clear rule of this circuit that if a plaintiff has not stated a federal claim, his pendant state law claims should be dismissed.").

### III.   Conclusion

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment (ECF No. 14) is **GRANTED**.

It is further **ORDERED** that Defendant's motion for leave to file an extended brief (ECF No. 13) is **GRANTED**. Defendant's brief in support of its motion for summary judgment is accepted as filed.

It is further **ORDERED** that Defendant's motion to exclude expert testimony (ECF No. 12)

is **DENIED**.

It is further **ORDERED** that the hearing scheduled for February 14, 2012 is **CANCELED** because oral argument will not aid in the disposition of the motion. E.D. Mich. L.R. 7.1(f)(2).

It is further **ORDERED** that Plaintiff's federal claims are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the Court **DECLINES** jurisdiction over Plaintiff's state law claims.

                                                 s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge

Dated: February 16, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 16, 2012.

                                         s/Tracy A. Jacobs
                                         TRACY A. JACOBS